IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ALBERT L. DEUTSCH | : | CIVIL ACTION |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JORDAN NAMEROW, ESQUIRE | : | |
| DAVID NENNER, ESQUIRE AND | : | |
| NENNER & NAMEROW, P.C. | : | NO. 17-4364 |

## MEMORANDUM OF DECISION

THOMAS J. RUETER                                   February 25, 2020
United States Magistrate Judge

This case concerns the breach of an agreement for the sale of a personal injury law practice. In addition to engendering bitter feelings between the seller and purchaser, the dispute resulted in multiple claims asserted against one another.

The undersigned held a bench trial from September 16, 2019 through September 18, 2019 to adjudicate the present dispute. The parties consented to the undersigned hearing this case and agreed that the court's decision would be binding on the parties with no right to appeal. (Docs. 29 and 31; N.T. 9/17/19 at 98-100; N.T. 9/18/19 at 3-4, 78-80.) This Memorandum will constitute the court's Findings of Facts and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52.

## I.      The Parties and the Nature of the Action

The plaintiff here is Albert L. Deutsch, Esquire ("Deutsch"), a retired attorney who now lives in Florida. Mr. Deutsch practiced law as a sole practitioner, maintaining a personal injury practice in Philadelphia, Pennsylvania. Prior to October 2011, his firm was known as Albert L. Deutsch Associates ("Deutsch Firm"). Defendant David Nenner ("Nenner")

became an attorney in 1985 and soon thereafter began working for Mr. Deutsch. Mr. Nenner left Mr. Deutsch's firm after approximately five years. Mr. Nenner is now an owner of his own law firm, Nenner & Namerow, P.C., which specializes in both criminal law and personal injury law. Defendant Jordan Namerow ("Namerow") is an attorney, admitted to practice in 2007, and also is an owner of Nenner & Namerow, P.C.

Pursuant to a Purchase Agreement dated October 1, 2011, between Albert L. Deutsch individually and on behalf of Albert L. Deutsch Associates and David S. Nenner on behalf of David S. Nenner & Associates, P.C., (hereinafter the "Purchase Agreement"),[1] the law firm of David S. Nenner & Associates, P.C., acquired the entire case load and all the assets of Mr. Deutsch's legal practice in exchange for consideration to be paid in the form of "goodwill."[2] On September 28, 2017, Mr. Deutsch initiated this action against defendants, Jordan Namerow, Esquire, David Nenner, Esquire, and Nenner & Namerow, P.C., (collectively, "Defendants"), for money allegedly owed to him pursuant to the Purchase Agreement. See Docs. 1 and 7 (Complaint and First Amended Complaint). Defendants subsequently filed a counterclaim, see Doc. 25, asserting that Deutsch breached his obligations under the Purchase Agreement, and that as a result of that breach, Deutsch owes monies to Defendants that far exceed any amount owed by Defendants to plaintiff for the purchase of Deutsch's personal injury practice.

---

[1]     The Purchase Agreement is attached to the First Amended Complaint as Exhibit A.

[2]     The purchaser under the Purchase Agreement is David S. Nenner & Associates, P.C. (hereinafter the "Nenner Firm"). After the parties executed the Purchase Agreement, Mr. Nenner hired Mr. Namerow to establish an office dedicated to servicing Mr. Deutsch's clients. Mr. Nenner also hired Mr. Deutsch's former secretary, Cheryl Murphy, and former paralegal, Alena Chalupecky. The new firm's name was "Deutsch, Nenner & Namerow." See N.T. 9/16/19 at 72-76, 96; see also Doc. 25 at ¶ 14. In 2014, the firm's name was changed to "Nenner & Namerow, P.C." See N.T. 9/16/19 at 122. Thus, Nenner & Namerow, P.C. (hereinafter "Nenner & Namerow") which is a defendant in this case, is a successor to David S. Nenner & Associates, P.C. See Doc. 25 at ¶ 7.

## II.    Negotiations for the Purchase Agreement

In 2009, Mr. Deutsch decided to retire and sell his law practice. He approached Mr. Nenner and asked if he was interested in purchasing the firm, but Mr. Nenner declined at that time. Soon thereafter, Mr. Deutsch entered into an agreement to sell his practice to Marvin Haber, Esquire ("Haber"). The parties executed a Purchase Agreement which was admitted into evidence as Exhibit D-4. The agreement with Mr. Haber was not successful. According to Mr. Deutsch, Mr. Haber did not make the required payments, embezzled client funds, and did not properly service Mr. Deutsch's former clients. As a result, Mr. Deutsch decided to disassociate himself from Mr. Haber. (N.T. 9/17/19 at 171-73.)

In 2011, Mr. Deutsch again approached Mr. Nenner, advised him of the difficulties he had with Mr. Haber, and offered to sell his practice to Mr. Nenner. The parties entered into the Purchase Agreement without any party retaining counsel.

## III.    Relevant Terms of the Purchase Agreement

The Purchase Agreement is not the model of clarity and contains at least one ambiguous provision. The court will summarize certain provisions of the Purchase Agreement that are most relevant to the present dispute.

The term of the Purchase Agreement commenced October 1, 2011 and continued "through and until the expiration date of October 1, 2016." (Purchase Agreement at ¶ IV(1).) Mr. Deutsch agreed to "transfer and convey his 'case load' and 'legal practice' to Nenner for fair consideration with the [monetary] amount of that 'consideration' to be established by Deutsch's 'goodwill.'" (Purchase Agreement at ¶ III.) The Purchase Agreement further provides that "'Nenner' desires to purchase Deutsch's 'case load' and 'legal practice' for fair and equitable

consideration." <u>Id.</u>  In addition, all payments to Deutsch were to be "earmarked for payment of 'Deutsch' goodwill." <u>Id.</u>  The Purchase Agreement defines "case load" as follows:

> all cases in possession of 'Deutsch' as of the date of commencement of this purchase agreement and any and all cases referred to 'Deutsch' thereafter.  The term 'case load' shall not include 'special cases' defined as medical malpractice cases, employment discrimination cases, civil rights cases and class action lawsuits that Deutsch … refers to the law firm of Kolsby, Gordon P.C., or other law firms at any time during the within five year Purchase Agreement.

(Purchase Agreement at ¶ I(4).)

Thus, pursuant to the terms of the Purchase Agreement, Mr. Deutsch was to convey his "case load," and "legal practice" to the Nenner Firm, and the Nenner Firm would acquire the "sole and exclusive right to represent [the] entire 'case load' and 'Nenner' shall be the sole recipient of Deutsch's referrals except for 'special cases' as previously described."  <u>See</u> Purchase Agreement at ¶ IV(12)(B).  The term "legal practice" is defined as "all assets, both 'tangible' and 'intangible' assets and/or propert(ies) owned by 'Deutsch' and utilized by 'Deutsch' in the practice of law, whether or not possessed by 'Deutsch' at the commencement of this agreement."  (Purchase Agreement at ¶ I(6).)

Additionally, the Purchase Agreement sets forth the following procedure for calculating "goodwill" thereunder:

> A.  For all "cases" received by Deutsch on any date both prior to and during the first year of this Agreement, "Nenner" shall pay Deutsch an amount that equals Fifty percent (50%) of the net legal fees paid on each case;
>
> B.  For all "cases" received by Deutsch on any date during the second year of this Agreement, Nenner shall pay Deutsch forty-five percent (45%) of net legal fees paid on each case;
>
> C.  For all "cases" received by Deutsch on any date during the third year of this Agreement, Nenner shall pay Deutsch forty percent (40%) of net legal fees paid on each case;

D.  For all "cases" received by Deutsch on any date during the fourth
    year of this Agreement, Nenner shall pay Deutsch thirty-five percent
    (35%) of net legal fees paid on each case;

E.  For all "cases" received by Deutsch on any date during the fifth year
    of this Agreement, Nenner shall pay Deutsch thirty-three and one-third
    percent (33 1/3%) of net legal fees paid on each case.

(Purchase Agreement at ¶ IV(2)(A)-(E).)  The parties also provided a method for payment of

referral fees during two option years after the term of the Purchase Agreement expired.  See

Purchase Agreement at ¶ IV(2)(F).[3]

Except for "special cases," Mr. Deutsch was restricted by a non-competition and

non-solicitation provision, which provided as follows:

Except as otherwise stated herein, Deutsch hereby agrees and promises
not to contact, contract with, solicit, notify, represent and/or refer to any
other lawyer and/or law firm any clients and/or cases as defined herein.
In addition, at the conclusion of this agreement or any
option year, if applicable, Deutsch hereby promises not to practice law
within the Commonwealth of Pennsylvania and within the State of New
Jersey for a period of not less than five (5) years unless "Deutsch" receives
prior written permission from Nenner to do so.  If Deutsch should be
contacted by any client after the expiration of the duration of this agreement,
then Deutsch hereby promises and agrees to refer each client requesting
and/or requiring legal representation to Nenner.

(Purchase Agreement at ¶ IV(13)(A).)

---

[3]     The Purchase Agreement states:

Deutsch shall have an option in years six and seven following termination of the
within Purchase Agreement occurring on or about October 1, 2016, to continue to
receive referral fees at the rate of thirty-three and one-third percent (33 1/3%) of
net legal fees but only if Deutsch satisfies the following conditions.  Deutsch must
be willing and able to provide "services" for Nenner's clients throughout years six
and seven as hereinafter described in paragraph seven, page 4 of 7 of the within
Purchase Agreement.  Deutsch shall be entitled to receive referral fees calculated
at the rate of Thirty-three and one-third percent (33 1/3%) for option years six and
seven so long as Deutsch's case referrals generate total attorney's fees of no less
than one hundred thousand dollars ($100,000) per year for each respective year
described as year six and year seven herein.

(Purchase Agreement at ¶ IV(2)(F).)

The Purchase Agreement also provides that at the end of its term, "Nenner shall have one hundred percent (100%) sole ownership and exclusive title to Deutsch's 'case load,' 'files' and 'legal practice,' including but not limited to, all phone numbers, files, client information, computer software, data base [sic] and any and all other assets," such that "Deutsch shall have no remaining ownership interest or legal interest or entitlement with respect to 'Deutsch' case load, files and/or 'Deutsch' legal practice." (Purchase Agreement at ¶ IV(12)(D).)

Because the Nenner Firm was acquiring the legal practice that was previously sold to Mr. Haber, the Purchase Agreement provides that Mr. Deutsch would defend and indemnify the Nenner Firm in relevant part as follows:

> In the event that any legal issues shall arise by and between Deutsch and Marvin F. Haber, and/or between Marvin F. Haber and "Nenner" then "Deutsch" hereby promises to defend and indemnify "Nenner" for any legal claims and/or law suits [sic] arising out of any legal dispute between Deutsch and Marvin F. Haber including, but not limited to those rights and obligations asserted pursuant to the "Purchase Agreements dated April 24, 2009["] and the within "Purchase Agreement dated October 1, 2011."
>
> ****
> Deutsch hereby agrees and promises to defend and/or indemnify Nenner against any legal malpractice claims or any other claims asserted by "Deutsch clients" arising out of any alleged acts and/or omissions occurring prior to commencement of the within Purchase Agreement.

(Purchase Agreement at ¶¶ II and IV(18).)

## IV. Method of Calculating Goodwill Payments Owed to Deutsch

At trial, the parties disputed the method by which "goodwill" payments should be calculated. Specifically, both have advanced different interpretations of the provisions in the Purchase Agreement that address this issue. Plaintiff posits that his percentage of fees owed for "goodwill" should be calculated based on when the client was retained by the firm, while

Defendants contend that the percentage should be determined when the funds or fees were received by the firm.

The court finds that the term "cases received by Deutsch" as used in the Purchase Agreement to calculate the percentage of net legal fees paid in each case by the Nenner Firm to Deutsch is ambiguous in that it is "reasonably susceptible of different constructions and capable of being understood in more than one sense." See Kripp v. Kripp, 849 A.2d 1159, 1163 (Pa. 2004) (citation omitted). As set forth more fully infra, this court concludes that the course of performance by the parties should control the interpretation of this ambiguous term.

Under the Purchase Agreement, if a case was settled and the funds were received after October 1, 2011, those funds are the property of the Nenner Firm, with Mr. Deutsch then entitled to a percentage of goodwill. Just after the commencement of the term of the Purchase Agreement, Mr. Deutsch began to provide handwritten notes of all resolved cases which included the percentage of goodwill owed. (N.T. 9/17/19 at 86-87.) These notes always allocated goodwill based on when the funds were received by Nenner & Namerow. Id. at 88 (emphasis added). When money from a case attributed to Mr. Deutsch came in, it would be deposited in the Nenner & Namerow firm escrow account, the firm would cut a check for the fees and costs, and then the firm would pay bills. (N.T. 9/16/19 at 83-84.)

Mr. Deutsch's practice of writing out in his own hand the percentage of what he thought he was owed, based on the date that the funds were received for each case in the case load, continued almost throughout the duration of the Purchase Agreement. (N.T. 9/17/19 at 87.) Defense exhibits D-16, D-36 and D-65 were created by Mr. Deutsch and reflect that he calculated goodwill based on when the recovery was received, or the settlement proceeds came into the office during the term of the Purchase Agreement. (N.T. 9/17/19 at 88.) For example:

- In September 2013, the Purchase Agreement was in its second year, and Mr. Deutsch calculated "goodwill" for all cases which fees were received at 45%, without regard to the date that the case was referred. See Exh. D-16.

- In October 2013, during the third year of the Purchase Agreement, Mr. Deutsch calculated "goodwill" for all cases which fees were received at 40%, without regard to the date that the case was referred. See Exh. D-16.

- In January 2014, during the third year of the Purchase Agreement, Mr. Deutsch calculated "goodwill" for all cases which fees were received at 40%, without regard to the date that the case was referred. See Exh. D-36.

- In June 2015, during the fourth year of the Purchase Agreement, Mr. Deutsch calculated "goodwill" for all cases which fees were received at 35%, without regard to the date that the case was referred. See Exh. D-65.

This methodology was consistent with the understanding of Messrs. Nenner and Namerow and reflects that all parties understood and agreed to the procedure for calculating goodwill over the entirety of the Purchase Agreement. (N.T. 9/17/19 at 87.) Thus, throughout the entirety of the Purchase Agreement, the parties' course of performance calculated Mr. Deutsch's goodwill based on when the funds were received in the office. (N.T. 9/17/19 at 102.) This course of performance -- that "goodwill" was to be calculated based on the date that the funds were received -- continued until the end of the term of the Purchase Agreement, when Mr. Deutsch retained counsel and advanced a new theory on how the Purchase Agreement should be interpreted. (N.T. 9/17/19 at 102.)

Pennsylvania caselaw guides that "the parties' interpretation [of a contract] is entitled to great, if not controlling, influence, and will generally be adopted and followed by the courts, particularly when the parties' interpretation is made before any controversy, or when the construction of one party is against the interest." Z & L Lumber Co. of Atlasburg v. Nordquist, 502 A.2d 697, 701 (Pa. Super. Ct. 1985) (citation omitted). See also Hawk v. Hawk, 2019 WL 2602186, at *6 (Pa. Super. Ct. June 20, 2019) (same). Course of performance evidence is

"perhaps the strongest indication of what the writing means" because the parties' performance of their own contract is a practical interpretation and construction of what they, themselves, intended.  Atlantic Richfield Co. v. Razumic, 390 A.2d 736, 741 (Pa. 1978).  "Where an agreement involves repeated occasions for performance by either party with knowledge of the nature of performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection is given great weight in the interpretation of the agreement."  Restatement (Second) of Contracts § 202(4) (1981).

As stated above, during the entire course of the performance of the Purchase Agreement, plaintiff and Defendants calculated the amount of fees owed to Deutsch based on when the cases settled or concluded, not when the clients were retained by Nenner & Namerow. Indeed, there exists no precise record of when the cases were received by the firm because the parties never calculated the fees owed on such basis.  Thus, using the parties' own course of conduct to calculate the fees, the court will now address Deutsch's claim for unpaid goodwill under the Purchase Agreement.

## V.     Defendants' Accounting of Amounts owed to Plaintiff

When the Nenner Firm acquired Mr. Deutsch's practice, Jordan Namerow primarily handled every personal injury case at the Nenner & Namerow firm.  (N.T. 9/17/19 at 104.)  He assumed day to day management of the firm.  Id. at 105.  Mr. Namerow became responsible for overseeing the firm's maintenance of personal injury records, and he had personal knowledge of these records and record-keeping.  (N.T. 9/17/19 at 106.)

The Nenner Firm paid to Mr. Deutsch approximately $145,000 in the first year and two months of the Purchase Agreement, and approximately $86,000 in the second year. (N.T. 9/18/19 at 145.)  In the third year of the Purchase Agreement, Mr. Deutsch received

$129,160, in the fourth year, $72,500, and in the fifth year, $104,257.  Id.  Ultimately, including a $25,000 payment made to Mr. Deutsch after the term of the Purchase Agreement ended, the Nenner Firm paid to Mr. Deutsch a total of $562,451.72.  (N.T. 9/17/19 at 133.)

Towards the October 1, 2016 expiration of the term of the Purchase Agreement, Mr. Deutsch's counsel demanded payment of the outstanding monies owed to Mr. Deutsch under the Purchase Agreement.  In response, Mr. Namerow sent to Mr. Deutsch client distribution summaries, IOLTA account statements, and settlements charts.  (N.T. 9/17/19 at 130.)  In this transmission, Mr. Namerow indicated: "I believe I removed any and all cases from the list that originated directly from my clients and/or sources, but I may have missed some.  However, I wanted to get you this information for your review."  See Exh. D-86 (emphasis added); see also N.T. 9/17/19 at 131.  The cover sheet showed a balance owed to Mr. Deutsch of $134, 248.11.  See Exh. P-8; see also N.T. 9/17/19 at 132.  Defendants applied certain offsets to the gross figure, including $5,000 they paid to resolve a malpractice claim brought by a former client of Messrs. Deutsch and Haber (the "Molina Matter").  Mr. Deutsch does not contest that the $5,000 for the Molina Matter should be offset.  After inclusion of the $5,000.00 for their payment of the settlement in the Molina Matter, as well as several thousand dollars in other offsets for a combined offset of $9,861.60, see Exh. P-8 at 2, by their own estimate, at that time, Defendants would still have owed Mr. Deutsch $124,386.51.

By letter dated August 11, 2017, Mr. Deutsch, through counsel, formally demanded payment of the $134,248.11 conceded to be due (absent any alleged offsets).  See Exh. P-25.  Defendants refused to pay this amount.  Instead, on September 27, 2017, Defendants remitted a check in the amount of $25,000.00, with no further explanation.  See Exh. P-26.  Thus, at that point, by Defendants' own calculation, they still owed Mr. Deutsch not less than

$99,386.51 ($124,386.51 minus $25,000). Defendants presently assert that at the time of the correspondence in August and September 2017, they were not aware of the existence of the Deutsch operating or IOLTA accounts, or other facts, pursuant to which they currently claim additional setoffs to the $99,386.51. (N.T. 9/17/19 at 159, 160.)

## VI.    **Disputed Setoffs**

After the above-described "Accounting" was made by Defendants, they claim that they discovered that the calculations made in the "Accounting" were incorrect because they attributed to Mr. Deutsch a substantial number of clients that were directly referred to Mr. Namerow, and that additional offsets or setoffs should be applied. (N.T. 9/16/19 at 107.)

To assist the court in narrowing the disputes, Defendants introduced Exhibit D-105, wherein Defendants assert that the undisputed amount owed to plaintiff for the time period of October 1, 2011 to October 1, 2016 is $613,916.84 and that Defendants paid plaintiff the total sum of $562,451.72 for a difference of $51,464[4] which is subject to any setoffs claimed by plaintiff and any offsets claimed by Defendants. Exhibit D-105 lists the undisputed offset of $5,000.00 for the settlement of the Molina case, leaving an undisputed amount of $46,464 owed to plaintiff. Plaintiff claims that Exhibit D-105 improperly lists an additional setoff for Defendants in the amount of $2,621.02 for the Brown and Robinson cases. The court agrees.[5]

---

[4]    The court notes that the difference between the undisputed amount owed to plaintiff during the term of the Purchase Agreement and the total amount paid to plaintiff is $51,465.12 ($613,916.84 - $562,451.72 = $51,465.12). However, the court will utilize the $51,464 figure, as the parties have agreed on this amount, through their submissions to the court, as the appropriate starting point for calculating offsets and additions. See Exh. D-105.

[5]    In the Proposed Findings of Fact Nos. 112-13, plaintiff disputes the offset taken by Defendants for fees for Shahera Nicole Brown and Nasir Robinson cases. Plaintiff claims that Defendants were not entitled to a percentage of the fees because the cases were settled before the commencement of the Purchase Agreement, but not paid until after when the court approved the minor compromise petitions. (Exhs. D-16, p. 48 and P-8, p. 283; Exhs. D-107, 108.) This position comports with the course of dealings between the parties. (N.T. 9/17/19 at 27-28, 143.)

Thus, the court finds that the undisputed amount remains at $46,464. The court will now proceed to address whether further setoffs should be made to the $46,464.

"[T]he right of set-off has long been recognized as part of the common law in Pennsylvania." Pennsylvania Nat'l Bank & Trust Co. v. CCNB Bank, NA., 667 A.2d 1151, 1153 (Pa. Super. Ct. 1995). "The right of setoff (also called 'offset') allows entities that owe each other money to apply their mutual debts against each other, thereby avoiding 'the absurdity of making A pay B when B owes A.'" Citizens Bank of Maryland v. Strumpf, 516 U.S. 16, 18 (1995) (quoting Studley v. Boylston Nat. Bank of Boston, 229 U.S. 523, 528 (1913)). "The historical antecedents of setoff rights are long and venerable and are based on the common-sense notion that 'a man should not be compelled to pay one moment what he will be entitled to recover back the next.'" U.S. on Behalf of I.R.S. v. Norton, 717 F.2d 767, 773 (3d Cir. 1983) (citation omitted).

### A.   Clients that were referred by Cheryl Murphy

Chart 2 of Defendants' Exhibit D-105 is a list of clients referred to the Nenner & Namerow firm by Cheryl Murphy, which includes: Karen McLaurin-Jones; Gregory Jones; Kathy Matthews; Brooke Matthews, Adrianna Matthews; and Michael Matthews. Each of these individuals was related to Ms. Murphy. The parties dispute whether these clients should be included on the list of clients referred by Mr. Deutsch such that he should receive goodwill payments from Defendants for these clients' cases. Defendants' "Accounting" included these clients, but Defendants state that this was a mistake because the clients were not referred to Mr. Deutsch but directly to Mr. Namerow. Plaintiff disputes this assertion and claims that a portion

---

Thus, this court agrees with plaintiff and finds that Defendants are not entitled to the offset of $2,621.02 for the Brown and Robinson cases as reflected in Exhibit D-105.

of the fees generated on these cases belong to Mr. Deutsch in accordance with the terms of the Purchase Agreement. The court agrees with plaintiff's position for the reasons that follow.

Ms. Murphy worked for Mr. Deutsch for approximately twenty-five years (Murphy Dep. at 8.) Mr. Deutsch testified that she was "my secretary, my friend, my client and a source of business." (N.T. 9/18/19 at 46.) During that time period, she referred clients to him (Murphy Dep. at 13.) She had no prior relationship with Mr. Namerow prior to his joining the firm. (Murphy Dep. at 14.) She never informed Mr. Namerow that she did not want Mr. Deutsch involved in any of her relative's matters. Id.

Prior to 2011, Mr. Deutsch represented not only Ms. Murphy, but Karen [Murphy] McLaurin-Jones and her husband, Gregory Jones. (N.T. 9/18/19 at 46.) Indeed, Defendants included Ms. Jones on the list of Mr. Deutsch's undisputed clients. See Exh. D-105 (Chart 1). Mr. Deutsch testified that even after the Purchase Agreement commencement date, he represented Ms. Jones and her husband, doing the initial intake and the work on their cases. (N.T. 9/18/19 at 46.) In fact, prior to the litigation, Defendants consistently attributed all of the Jones and Matthews matters to Mr. Deutsch, as reflected on their calculation of fees owed to Deutsch in 2016. See Exh. P-8; Exh. P-7 (Settlement Charts); Exhs. P-14, P-15, P-16 (the Distribution Summaries); Exh. P-20 (fees deposited into the Deutsch IOLTA Account).

The court disagrees with Defendants' claim that the cases of the clients referred to the firm by Ms. Murphy should not result in a goodwill payment to Mr. Deutsch because they were not his clients. But for Mr. Deutsch's relationship with Ms. Murphy, the cases would not have been referred to the Nenner and Namerow firm and, prior to this litigation, Defendants clearly considered the "Murphy Clients" to be properly attributable to Mr. Deutsch, as reflected in all of the contemporaneous documentation. The court therefore finds that plaintiff is owed the

amount of $6,416.00 for fees generated by these clients' cases prior to the termination of the Purchase Agreement on October 1, 2016. See Doc. 106 (Table 4, noting error in Defendants' Exh. D-105 Chart 2). Thus, the court will add the amount of $6,416.00 to undisputed amount of $46,464 for a total of $52,880 owed to plaintiff for goodwill payments.

**B.      Goodwill Payments Claimed by Plaintiff for Cases of Clients Belonging to Jordan Namerow or David Nenner**

Chart 4 of Exhibit D-105 is a list of other referrals made directly to Jordan Namerow, for which Mr. Deutsch now seeks credit. (N.T. 9/17/19 at 136.) Those clients include: Camyra Johnson; Betty Gregoire; Makenzy Gregoire; Jean Hack; Daphlee Civil; James and Kristine Dougherty; Carolyn Palmer; Jonathan Romero; Angelica DeJesus; Octavia Smith; Erica Thomas; Jeanette Holland; Porsche Holland; Aaron Rice; Svene Beck; Aubrey Johnson; Anthony DeShields. For the reasons that follow, the court finds that cases were not referred by plaintiff and, thus he is not entitled to fees for the cases of these clients.

Dr. Joseph Eugene ("Gene") Nelson testified that he specifically referred clients Jonathan Romero and Angelica DeJesus to Mr. Namerow. (N.T. 9/18/19 at 69.) Additionally, the following clients were direct referrals to Mr. Namerow: Mendossa Civil was referred directly to Mr. Namerow by Demetrius Odin (Mr. Deutsch never represented Mr. Odin); Mendossa Civil then referred a client named Daphlee Civil directly to Mr. Namerow (Ms. Civil had no prior relationship with Mr. Deutsch, no knowledge of who Mr. Deutsch was, she was not a prior client, and only came to Nenner & Namerow because of Mr. Namerow's representation of Mendossa Civil); Daphlee Civil was so pleased with Mr. Namerow's representation that she referred Makenzy Gregire and Betty Gregire directly to Mr. Namerow for a New Jersey motor vehicle accident. (N.T. 9/17/19 at 60-61.) All of these referrals were solely as a result of Mr. Namerow's actions. (N.T. 9/17/19 at 78.)

Jean Hack directly engaged Nenner & Namerow.  She had no prior cases, no previous knowledge of Mr. Deutsch, and had no prior relationship with any of Mr. Deutsch's previous firms.  (N.T. 9/17/19 at 61.)  Mr. Deutsch had no prior relationship with Jean Hack.  (N.T. 9/17/19 at 61-62.)

Mr. Namerow met Dr. Greg Nelson, a physician, through a representative of a durable medical equipment company, who arranged a lunch with Dr. Nelson and Mr. Namerow.  (N.T. 9/17/19 at 62.)  Mr. Deutsch had nothing to do with Mr. Namerow building a rapport with Dr. Greg Nelson.  (N.T. 9/17/19 at 76.)  Mr. Namerow went to lunch several times with Dr. Nelson to cultivate a relationship with him.  Id.  Dr. Greg Nelson referred clients Jeanette Holland, Porsche Holland, and Aaron Rice directly to Mr. Namerow.  (Exh. D-105 (Chart 4); N.T. 9/17/19 at 136.)

Carolyn Palmer is the mother of Anthony DeShields, and she was referred directly to Mr. Namerow by Anthony DeShields.  (N.T. 9/17/19 at 74.)  There is no relationship between Mr. DeShields or Ms. Palmer with Mr. Deutsch.  Id.  Erica Thomas was a referral directly to Mr. Namerow through her husband.  (N.T. 9/17/19 at 66.)  Octavia Smith had no prior relationships with Mr. Deutsch.  (N.T. 9/17/19 at 65.)

Aubrey Johnson was referred to Mr. Namerow by her mother, Amanda Lopez; neither of them had any previous relationship with Mr. Deutsch.  (N.T. 9/17/19 at 67.)  Svene Beck had a previous attorney before engaging the Nenner & Namerow Firm, and when he did engage the firm, he went directly to Mr. Namerow.  (N.T. 9/17/19 at 66.)  Finally, Mr. Namerow testified credibly that each of the clients on Chart 4, including Camyra Johnson and James and Kristine Dougherty, "were referred directly to me and/or had no nexus to Mr. Deutsch."  (N.T.

9/17/19 at 136.)  Accordingly, none of the clients on Chart 4 of Exhibit D-105 can be attributed to Mr. Deutsch.  Id.

Mr. Deutsch vaguely testified at trial that he may have had previous relationships with some of these disputed clients.  See, e.g., N.T. 9/18/19 at 45.  ("I believe that I handled an Anthony DeShields case before 10/1/11 and it's my believe [sic] that they are of the same family.").  However, Mr. Deutsch has produced no evidence to support this belief.   Moreover, there is no provision in the Purchase Agreement which supports the interpretation that a tangential prior relationship with a referral source would constitute a "referral," when the referral source specifically intended to refer the new case to Mr. Namerow and not Mr. Deutsch.

Accordingly, for all the above reasons, Mr. Deutsch is not entitled to any fees from the cases of the above clients.  Defendants properly subtracted from the accounting amount, the $54,983.20 in fees (Exh. D-105, Chart 4) allegedly owed to Deutsch for the period prior to October 1, 2016.

Thus, the undisputed amount owed to plaintiff by Defendants remains, at this time, $52,880, with further offsets or setoffs to the amount discussed below.

C.     Offset Claim for Failure of Plaintiff to Refer the Chorney Case

Defendants claim an offset of $18,603.07 based on their contention that Deutsch should have referred a case involving Maurice Chorney to Defendants, rather than the Kolsby Gordon firm.  (Exh. D-105.)  The court rejects this contention.  The Chorney matter was properly referred to Kolsby Gordon in 2012, and therefore, Defendants are not entitled to any proceeds from that case.

As provided for in the Purchase Agreement, Mr. Deutsch has the right to refer "special cases" to the Kolsby Gordon firm, rather than to Nenner & Namerow.  Such "special

cases" included medical malpractice cases.  <u>See</u> Exh. P-6.  It is clear that the <u>Chorney</u> matter

was, in fact, a medical malpractice case.  Mr. Chorney fell at a rehabilitation facility while trying

to get out of bed unassisted.  The predicate for the alleged liability was that the physicians at a

rehabilitation facility had failed to place a medical order for safety devices, such as gym mats

and a bed alarm, in order to minimize the risk of falls.  <u>See</u> Exh. D-10 ("It is evident from the

Physician Orders and Administration records that these safety measures were not used.").

Although defense counsel attempted to impeach Mr. Deutsch at trial in regard to the nature of the

<u>Chorney</u> matter based on his deposition testimony, it was clear that Mr. Deutsch had confused

the <u>Chorney</u> case at issue with an earlier case for another member of the Chorney family.  <u>See</u>

N.T. 9/18/19 at 29.

      For all the above reasons, Defendants are not entitled to an offset for the <u>Chorney</u>

case.

> **D.**      **<u>Defendants are Not Entitled to an Offset for the Failure to Pay Them 22% of the Referral Fee for the Rainey Case</u>**

      Defendants claim that Mr. Deutsch failed to pay them 22% of the proceeds from

the <u>Rainey</u> case referred to Kolsby Gordon.  Mr. Deutsch received a referral fee from Kolsby

Gordon of $16,361.46 on or about January 6, 2015 for the <u>Rainey</u> case, but Defendants never

received the required 22%, which amounts to $3,599.52.  (Exhs. D-12, D-105; N.T. 9/16/19 at

186-188.)

      The Purchase Agreement provides that:

> Nenner shall have no right to any legal fees from "special cases" for the
> first three years of the within Purchase agreement.  Thereafter, Deutsch
> shall pay Nenner twenty-two (22%) percent of any legal fees paid to
> Deutsch by other law firms for "special cases" <u>that were referred by Deutsch
> to those law firms during years four and five of the within Purchase Agreement</u>.

(Purchase Agreement at ¶ I(4)) (emphasis added). This provision of the Purchase Agreement is clear and unambiguous. The Nenner Firm is not entitled to a percentage of the legal fees from the special cases unless they were referred by Deutsch during years four and five of the Purchase Agreement. The <u>Rainey</u> case was not referred to Kolsby Gordon during those years. <u>See</u> N.T. 9/17/19 at 177-78. Accordingly, Defendants are not entitled to an offset of $3,599.52 for the <u>Rainey</u> case; the amount owed by Defendants remains $52,880.00.

### E. Defendants' Claim for Offset for Fineman Case

Defendants claim an offset for Mr. Deutsch's referral of a case called <u>Fineman</u> to Florida counsel. No fee has been collected, so at this time there is no basis for an offset. Mr. Deutsch testified that he referred the <u>Fineman</u> matter to a Florida lawyer who had specific expertise in municipal law and discussed the matter with Mr. Namerow. (N.T. 9/18/19 at 30, 154-55.) Although Mr. Nenner is licensed to practice law in Florida, his expertise is in criminal law and personal injury law. (N.T. 9/16/19 at 115.) He is not an expert in Florida municipal law. Mr. Deutsch's referral to the Florida attorney was in the best interest of the client and Mr. Deutsch stated that he "would have turned down the case if there was an objection to me referring it to a Florida attorney." (N.T. 9/18/19 at 155.) Therefore, Defendants are not entitled to any fees for the <u>Fineman</u> case and thus no offset applies.

### F. Defendants' Claim for Offset for Attorney Time Defending Deutsch in the Molina Case

According to the terms of the Purchase Agreement, Mr. Deutsch was responsible for defending and indemnifying Nenner & Namerow in the event of a claim arising out of his case load prior to October 2011. (N.T. 9/17/19 at 109.) In December 2012, Mr. Deutsch, the Deutsch Firm, and Mr. Haber were sued by Marta and Suddael Molina. <u>See</u> Exh. D-21. As of this time, the Nenner Firm had acquired the assets of the Deutsch firm. (N.T. 9/17/19 at 109.)

The Molina Complaint alleged, inter alia, that a settlement was entered into without client authorization, and a statute of limitations was missed. Additionally, the clients believe they retained Albert L. Deutsch and Associates, being unaware of Mr. Haber's previous involvement. (N.T. 9/17/19 at 110.)

After the Molina Complaint was served, Mr. Deutsch was concerned about the claims alleged therein and the potential that there was no insurance coverage. (Exh. D-26; N.T. 9/17/19 at 110.) Thus, Mr. Deutsch asked Nenner & Namerow to defend him and resolve the case and stated that he would "work it out later" as to what was paid and how Nenner & Namerow would be compensated. (N.T. 9/16/19 at 165.)

Mr. Namerow defended Mr. Deutsch throughout the entirety of the Molina Matter. Mr. Namerow attended case management conferences and a settlement conference. Mr. Namerow spent a minimum of a minimum of twenty-five hours litigating the Molina case on Mr. Deutsch's behalf. (N.T. 9/17/19 at 111.) The Deutsch Firm was never insured under Mr. Haber's separate insurance policy, and therefore, there was no coverage for Mr. Deutsch and his firm. (N.T. 9/17/19 at 112.) Ultimately, to resolve the Molina Matter, Nenner & Namerow was compelled to pay $5,000 to settle the case; Mr. Deutsch never compensated Nenner & Namerow for that payment. (N.T. 9/16/19 at 166.)

At the time the Molina case was filed, Mr. Namerow had been a licensed attorney for five years. Mr. Namerow was admitted to the Pennsylvania Bar on December 4, 2007. See www.padisciplinaryboard.org/for-the-public/find-attoney/attorney-detail/206134 (accessed 2/18/20). According to the Community Legal Services, Inc. ("CLS") Fee Schedule, a Philadelphia attorney with two to five years' experience commands an hourly rate of $230 to $275. See https://clsphila.org/about-community-legal-services/attorney-fees/ (accessed 2/18/20).

See also Maldonado v. Houstun, 256 F.3d 181, 187 (3d Cir. 2001) (finding that the CLS fee schedule "to be a fair reflection of the prevailing market rates in Philadelphia") (citation omitted). The court finds that Defendants are entitled to compensation on a quantum meruit basis for Mr. Namerow's time in resolving the Molina case.[6] The court finds $275 an hour to be reasonable given Mr. Namerow's experience at the time and the excellent result accomplished on behalf of Mr. Deutsch. Accordingly, Defendants are awarded $6,875 (25 hours x $275 hourly rate), for attorney fees to be applied as an offset toward any amounts owed to plaintiff. Thus, with application of the setoff, the revised amount owed to Defendants is $46,005.00 ($52,880.00 minus $6,875).

### G. Defendants Do Not Have a Valid Claim or Offset for the Account Balance in Plaintiff's IOLTA and Operating Accounts as of October 1, 2011

At trial, Defendants claimed that they were entitled to the fund balance in Mr. Deutsch's IOLTA and business accounts as of October 1, 2011. Defendants never made a claim for the fund balances in their counterclaim. Nothing in Defendants' counterclaim can reasonably be read to provide notice to plaintiff that they were asserting an affirmative claim for the escrow or operating fund balances. See (Doc. 25) (Answer and Counterclaim). See also Fed. R. Civ. P. 8(a)(2) (a counterclaim shall contain "a short and plain statement of the claim showing that the pleader is entitled to relief"); Phillips v. Cty. of Allegheny, 515 F.3d 224, 232 (3d Cir. 2008) ("Rule 8(a)(2) requires a 'showing' rather than a blanket assertion of an entitlement to relief. We caution that without some factual allegation in the complaint, a claimant cannot satisfy the

---

[6] "Quantum meruit is defined as 'as much as deserved.' Quantum meruit measures recovery under implied contract to pay compensation as reasonable value of services rendered. Quantum meruit is an equitable doctrine." Paul v. Horton, 1996 WL 297572, at *8 (E.D. Pa. May 22, 1996) (internal citations and quotations omitted). "Under Pennsylvania law, 'when a person receives a benefit from another, and it would be unconscionable for the recipient to retain that benefit, the doctrine of unjust enrichment requires the recipient to make restitution.'" Peterson v. Crown Financial Corp., 661 F.2d 287, 295 (3d Cir. 1981) (citations omitted).

requirement that he or she provide not only 'fair notice,' but also the 'grounds' on which the claim rests.") (citing <u>Bell Atlantic Corp v. Twombly</u>, 550 U.S. 544, 555 (2007)).  As a result, Defendants' claim for the starting balances in the escrow and operating accounts can only operate as offsets to plaintiff's claims, not as an affirmative counterclaim.  As explained below, Defendants have not proven that they have a right to offset for the IOLTA and operating accounts.

Mr. Nenner admitted that when he signed the Purchase Agreement, he had no reasonable expectation that he had a right to any assets in Mr. Deutsch's escrow bank account that preexisted prior to the effective date of the Purchase Agreement.  (N.T. 9/16/19 at 67-68.) Furthermore, Mr. Nenner conceded that Defendants were not entitled to the starting balance for the IOLTA account.  The following exchange transpired at trial:

| | |
|---|---|
| Nenner: | So in answer to your question at the deposition, I was indicating to you that, if in 2011 and 2012, he had money left over from funds that were collected before the start of our agreement, <u>obviously I would have no claim to it, and I'm not changing that.</u> |
| | * * * |
| Plaintiff's counsel: | -- just to be clear, I'm only talking about pre-2011 money. You're not making any claim to money that came in prior to October 1, 2011, into the IOLTA Account? |
| Nenner: | If it was deposited in 2011 or 2012, yes. |
| Plaintiff's counsel: | Or, wait.  Prior, yes, you are making a claim to it? |
| Nenner: | <u>No, I'm not making a claim if it was money that predated the contract.</u> |

(N.T. 9/16/19 at 211-12) (emphasis added).

As Mr. Deutsch testified, the escrow account had laid dormant for many years – even predating his relationship with Mr. Haber – with the intent of using the money for his

daughter's wedding. (N.T. 9/18/19 at 14-15.) By Mr. Nenner's own admission, if Mr. Deutsch

had simply closed the accounts and taken the assets prior to October 1, 2011, he would have had

no claim to the balances. Similarly, with the possible exception of workers' compensation cases,

Mr. Nenner conceded that he had no financial interest in any cases in which the case was

resolved and the fee paid prior to October 1, 2011. (N.T. 9/16/19 at 58.) In addition, Defendants

did not meet their burden of establishing the balance in the IOLTA account as of October 1, 2011

in any event. The earliest statement from the IOLTA account is dated February 1, 2012. See

Exh. D-14. As a result, Defendants have no basis for claiming a setoff in the amounts contained

in either the IOLTA account or the operating account as of October 1, 2011, especially in regard

to the IOLTA account, in which Mr. Nenner admitted at trial that he was not making a claim for

the funds balance at the start of the Purchase Agreement.[7]

### H.  Defendants Do Not Have an Offset for the Initial Funds, or the Additional Funds Deposited Into the Deutsch Operating Account

Defendants claim that they are entitled to offset of $104,948.84 based on the

initial account balance of $12,437.86 plus additional deposits (other than deposits from referral

fees from Kolsby Gordon) into Mr. Deutsch's operating account during the initial five year term

of the Purchase Agreement. See Exh. D-105, Chart 6.[8] Defendants are not entitled to the initial

---

[7]     Unlike their claim as to the Operating Account, Defendants did not state that they were
entitled to an offset for subsequent deposits into the IOLTA Account. See Exh. D-105 Chart 5
(asking only for initial account balance in IOLTA Account). Mr. Deutsch testified that any
subsequent deposits into the IOLTA account were from cases that were settled prior to the
effective date of the Purchase Agreement, but for which the payment of fees was delayed for one
reason or another (such as the need to get court approval of a minor's compromise). (N.T.
9/18/19 at 22-23.) Mr. Deutsch denied ever "cheating" Defendants of any monies. (N.T.
9/18/19 at 24-25.) The court credits Mr. Deutsch's testimony.

[8]     The "Statement date" reference in Exhibit D-105, Chart 6 is actually the "starting
balance" date for the period covered by that respective statement, not the date that the statement
was issued.

balance of the operating account for the same reasons that they were not entitled to the initial balance of the escrow account. Although Defendants seem to claim that they are entitled to the subsequent deposits based solely on the "acquisition" of the account, by their own exclusion of the Kolsby Gordon referral fees to which they made no independent claim, they have effectively conceded that they are only entitled to funds that were deposited if they had an independent right to share the fee under the provisions of the Purchase Agreement. Thus, Defendants claim for the entire amount of the deposits (excluding the Kolsby Gordon checks) is without merit. Even if the court were to accept Defendants' arguments that they were entitled to some share of the deposits into the operating account, they would only be entitled to a percentage of those deposits. Defendants' demand for the entire amount of deposits must be rejected.

       In addition, by not identifying the source of the deposits, Defendants have failed to meet their burden of proving an entitlement to such deposits. For example, even though Mr. Nenner's testimony regarding whether he was making a claim for worker's compensation fees was unclear, see N.T. 9/16/19 at 128-136, the plain language of the Purchase Agreement provides that Defendants were not entitled to the proceeds of any recurring fees earned on worker's compensation cases which began prior to October 1, 2011, but resulted in recurring payments, except for those resolved by compromise and release, see Purchase Agreement at ¶ IV(3)(B). Indeed, Defendants had the worker's compensation checks forwarded directly to Mr. Deutsch. See Exh. P-23. Thus, the Nenner Firm cannot claim that it should be entitled to everything deposited in the operating account, regardless of the source of funds. Id. In fact, in the vast majority of cases, the evidence strongly suggests that the deposits were recurring fees for worker's compensation cases to which Defendants had no entitlement. For example, listed on Exhibit D-105, Chart 6, are multiple deposits of approximately $1,226 (see deposits dated

3/20/2012, 4/18/2012); $1,033 (see deposits dated 6/19/2014, 8/19/2014); $1,166.26 (see deposits dated 2/15/2014 and 9/18/2015) and $686 (see deposits dated 10/20/2015, 11/17/2015, 12/18/2015 and 1/16/2016).[9]  Indeed, a careful review of Exhibit D-105, Chart 6 shows various instances in which the monthly aggregate deposit consists of two smaller deposits in recurring amounts.  For example, the Bank of America statement dated November 16, 2013, has aggregate deposits of $1,755.59 in deposits, made up of two deposits of $929.64 and $825.94 – almost the exact amounts of single deposits reflected on the July 19, 2013 statement and the January 18, 2014, statement, respectively.  See Exh. D-13.  Mr. Deutsch credibly testified that he was receiving approximately $30,000 per year from recurring worker's compensation fees at the outset of the contract, which eventually dwindled to approximately $8,900 per year.  (N.T. 9/18/19 at 27-28.)

Similarly, Mr. Deutsch testified that all of the deposits in the account came from one of two sources: either checks from Kolsby Gordon for special cases (which Defendants had backed out from their calculation), or from worker's compensation cases, which he was specifically able to correlate to the W-2's from his tax returns.  (N.T. 9/18/19 at 25-29.)  The court credits Mr. Deutsch's testimony.  Moreover, Defendants presented no evidence that any of the deposits made into Mr. Deutsch's accounts were from fees improperly diverted from Nenner & Namerow.  As a result, Defendants did not meet their burden of proving that they are entitled to an offset for the funds either initially deposited into Mr. Deutsch's operating account or deposited thereafter.

---

[9]  The minor variations are because Defendants included monthly interest in the deposit calculation.

## I. Reimbursement to Deutsch for Costs He Incurred Prior to October 1, 2011

Under the Purchase Agreement, Deutsch was entitled to full reimbursement of costs incurred prior to the effective date of the agreement. See Purchase Agreement at ¶ IV(6). However, with respect to certain cases, Defendants failed to reimburse Deutsch for such costs. Those unreimbursed costs are reflected in the Distribution Summaries, see Exhs. P-12, P-13, P-14, and summarized at Table 3, attached to Plaintiff's Proposed Findings of Fact and Conclusions of Law. See Doc. 106. Defendants have pointed to no evidence to contradict these summaries. Based on these documents, the court finds Defendants owe plaintiff $12,208.76 in unreimbursed costs incurred prior to October 1, 2011. This increases the amount owed to plaintiff by Defendants to $58,213.76 ($46,005.00 plus $12,208.76).

## J. Offset for the Loss of the Value of Deutsch's Services

Defendants claim that plaintiff did not fulfill his contractual responsibilities by failing to service his caseload as required by the Purchase Agreement. Section IV, paragraph 7, of the Purchase Agreement provides:

> During the course of this agreement … Deutsch shall have the obligation and duty to continue to service his "case load," taking into consideration that Deutsch is semi-retired and spends approximately six and one-half months in Florida. It is understood that Deutsch for the most part, will not go to court or engage in litigation. "Services" for purposes of this agreement shall include, but not be limited to, conducting interviews, conducting case investigations, drafting demand letters, intervening in client disputes, settling cases, and any other activity that needs to be undertaken in furtherance of the enhancement of client good will.

(Purchase Agreement at ¶ IV(7).)

Mr. Deutsch faced technical challenges in servicing the "caseload" while he was in Florida for one-half of the year. He was not proficient in the use of digital services such as email and other remote services. Nonetheless, the trial record shows that from 2011 to 2013, he

did perform a sufficient amount of services under the Purchase Agreement to satisfy its terms. However, as time progressed, his effort diminished to the extent that by 2014, he did not service his "caseload" within the meaning of the Purchase Agreement. As a result, by early 2014, the parties' relationship was seriously strained. In essence, Deutsch believed that Nenner breached the Purchase Agreement because Deutsch was not receiving the timely goodwill payments and Nenner believed that his firm was losing money because Deutsch was not servicing the caseload to the extent required under the Purchase Agreement. Things came to a head in March of 2014, when the parties exchanged a series of emails. In an email dated March 31, 2014, at 3:46 p.m., Deutsch complained that the Nenner Firm breached the Purchase Agreement by failing to make timely goodwill payments and offered to withdraw from the firm in exchange for the Nenner Firm making monthly payments to him. See Exh. D-42. Deutsch explained to Nenner and Namerow: "I need to have a steady flow of money. At this juncture, the two of you are about $200,000 behind in payments…. Under these circumstances, I'm suggesting that we consider option one with monthly payments to me with me being no longer part of the firm." Id.

On that day, at 5:25 p.m., Mr. Namerow replied that he would not agree to the proposal made by Deutsch. He stated, in part, as follows:

> While I appreciate your suggestion regarding option 1, the full details remain unclear. For example, if David and I opt for option 1, what is your position regarding the option years? To be clear, full ownership, including all the good and bad that comes with it, transfers at the conclusion of year 5 or October 1, 2016, assuming back fees are paid in full. Additionally, the option years are predicated on you continuing to work, as outlined in the Purchase Agreement. However, as I understand it, you described option 1 as David and I just paying you fees owed and into the future without you continuing to work. If my understanding is correct, and you would not be servicing the clients or working on the cases at all, then the option years would be off the table. Again, I am just not sure why David and I would agree to option 1 when that is essentially the agreement we presently have, but you are required to work on the cases. However, I may be missing something.

(Exh. D-43.)

At 8:29 p.m. that day, Deutsch replied to Namerow:

You are being rather pugnacious and perhaps you are mishandling me. Are you trying to push me towards taking a hard line? If so you are being successful, although I would rather proceed with an olive branch. To be succinct, the contract has been breached. I would like you to consider the option I presented in good faith. I cannot proceed with the contract being breached each and every month. I want to find a way we can find a resolution without you being on the attack. Please read what I stated in my email earlier today. I still want to work but without running to the mailbox looking for long overdue checks and being disappointed. For the sake of the three of us please curb your aggressiveness and consider what I presented to you earlier today. If you need my work input it will be there on behalf of the firm. As I said to you a short time ago – CHILL.

Id.

At 9:18 p.m. that day, Mr. Nenner joined in and replied to Mr. Deutsch, as

follows:

Actually, the contract was technically breached by all parties in excess of over a year ago. Despite our best efforts to comply with the payment terms over the first 24 months as set forth in the contract we have been unable to do so. The reasons are twofold: First you totally overvalued the good will of the practice using income figures that predated Mervs destruction of your practice. As you know Merv stole $ from clients and systematically ran the practice into the ground. Frankly if it wasn't for me borrowing in excess of $100000 dollars to financially revive the practice and Jordan's dedication to repairing the practice you wouldn't be in Florida soaking up the sun. Moreover you have not kept your part of the bargain either. Your ghost appearances in the summer and your lack of production overall falls woefully short of your obligations under the agreement. In short while we originally intended to comply with the strict payment terms of the first 24 month period we like you have deviated from those terms. Nonetheless for you now at this late stage to scream material breach is disingenuous. We have now operated over the last two years under the premise that Jordan and I would pay you any surplus after monies were expended to keep the practice afloat. It is clear to me that all parties have agreed to waive the apportionment of your work efforts and our timeliness of payments. That being said Jordan and I are as eager as you to pay the back balance as well as future percentages. With that in mind we will use our best efforts to pay a minimum of $3000 per month to pay the back balance plus the % owed for monthly fees received from now until fulfillment of the contract in 2016. If we have to secure a loan to complete payments by Oct. 2016 we will try to do so. That being said I

am not inclined to alter the agreement in any fashion beyond those issues deemed waived by our mutual prior adjustments to the contract.

(Exh. D-43 (emphasis added).)

As stated in the above email, Mr. Nenner did not agree to Mr. Deutsch's proposal to be relieved of his obligation to service his clients pursuant to the Purchase Agreement, because as he explained at trial "Why would I do that? He already had that obligation." (N.T. 9/16/19 at 140.) Although the parties did not agree that Mr. Deutsch could stop working on the files, Mr. Deutsch did so anyway, and Mr. Deutsch's work for all intents and purposes stopped. (N.T. 9/17/19 at 119-20.) On April 1, 2014, Mr. Deutsch wrote an email and once again proposed that he could change his obligation under the Purchase Agreement in relevant part as follows: (1) "Deutsch has the option of not doing office work or going to Court and therefore need not keep up his CLE credits," and (2) "Deutsch shall continue to carry out his duties by phone, internet and dictation." (Exh. D-44.) Mr. Deutsch admits that he requested a written modification of the Purchase Agreement to reflect these proposed changes, but he was never given a written modification, which was required by the Purchase Agreement pursuant to paragraph IV(14). (N.T. 9/18/19 at 122.) In fact, on April 30, 2014, Mr. Deutsch wrote to Mr. Namerow again and stated: "I have suggested an addendum to our contract. Obviously, there is a lack of interest in doing so, although there are areas of disagreement." (Exh. D-45.)

The Nenner Firm never waived, relinquished, or modified the agreement that Mr. Deutsch was required to service his case load. (N.T. 9/16/19 at 159.) Furthermore, the Nenner Firm never waived the precondition of the "Option" in the Purchase Agreement that Mr. Deutsch must be "willing and able" to service his caseload. Id. Indeed, Mr. Deutsch admits that the provision in the Purchase Agreement requiring him to service the caseload, was never changed or modified. (N.T. 9/18/19 at 143.)

Despite the fact that Messrs. Nenner and Namerow never agreed to Mr. Deutsch's suggestion that he cease office work, Mr. Deutsch in the Spring of 2014 stopped coming into the office in Philadelphia and did not service the caseload for Nenner & Namerow. (N.T. 9/16/19 at 122-123; N.T. 9/17/19 at 119; N.T. 9/18/19 at 105.) On April 30, 2014, Mr. Deutsch reported that he "reside[s] full time in Florida." (Exh. P-49.) In fact, Mr. Deutsch admitted that from April 2014 through October 2016, he only came into the office in Philadelphia approximately two times. (N.T. 9/18/19 at 141.) The two times he came to the office were not to work, but for Mr. Namerow to take him to lunch. (N.T. 9/17/19 at 81.) From April 1, 2014 through the expiration of the Purchase Agreement, Mr. Deutsch never attempted to take an active role in servicing his caseload, and his productivity substantially decreased. (N.T. 9/17/19 at 120.) Accordingly, from 2014 forward, Mr. Namerow effectively became solely responsible for servicing the caseload. (N.T. 9/17/19 at 129.) This occurred prior to the change of the firm name from "Deutsch, Nenner & Namerow" to "Nenner & Namerow" in June 2014. (N.T. 9/16/19 at 122-24.)

This court credits the testimony of Mr. Nenner, that by the Spring of 2014, Deutsch did not service his caseload to the extent required by the Purchase Agreement. "The only thing he did was draft a few demand letters, and there [were] a whole lot of complications … that's all he basically did." (N.T. 9/16/19 at 82.) "[H]e was supposed to do investigation[s], he was supposed to be the chief of the files, he was supposed to handle those, and he did not. And every year, as we went on, it got less and less." (N.T. 9/16/19 at 83.) While it is true that after 2014, Mr. Deutsch periodically asked Mr. Namerow to mail files to him in Florida so that he could work on them, Mr. Namerow concluded that Mr. Deutsch's work product was poor and caused more harm than good. As he stated in an email to Mr. Deutsch, "You complain about

files, but then they sit or the work is incomplete and there ends up being messes that have to be cleaned up. That makes me less inclined to send work and more likely to simply deal with the cases internally." (Exh. D-81.)

While the court finds that as of 2014 Mr. Deutsch was not servicing the caseload, the court will not apply an offset for this breach of the Purchase Agreement against the amounts owed by Defendants to plaintiff. As found earlier, from 2011 to 2013, Mr. Deutsch adequately satisfied his service obligations under the Purchase Agreement. His decision to stop in 2014 coincided with the failure of Nenner & Namerow to make timely goodwill payments to him. Hence, as Mr. Nenner stated in his March 31, 2014 email, see Exh. D-43, the parties were operating under a tacit "standstill" agreement[10] whereby neither side would enforce a breach of the agreement since both sides were in breach. See N.T. 9/16/19 at 139-140. Thus, under these circumstances, the court finds it would not be equitable to apply an offset against the amounts owed to plaintiff. See Norton, 717 F.2d at 772 (courts have "broad equitable discretion" in recognizing set off rights defined by the common law); Foster v. Mut. Fire, Marine and Inland Ins. Co., 614 A.2d 1086, 1095 (Pa. 1992) ("[T]he common law right to setoff, a form of contractual impairment, is an equitable right to be permitted solely within the sound discretion of the court.") (citations omitted).

## VII.   The Option to Extend the Contract Could Not Be Exercised by Plaintiff

In September of 2016, plaintiff attempted to exercise his option to extend the Purchase Agreement for an additional two years. (N.T. 9/17/16 at 49-50.) For the reasons stated above, Mr. Deutsch could not exercise the option in the Purchase Agreement to extend the term for years seven and eight because, as of 2014, he was not "willing and able" to service the

---

[10]     A "standstill agreement" is "[a]ny agreement to refrain from taking further action." Black's Law Dictionary at 1536 (9th ed. 2009).

caseload. (N.T. 9/16/19 at 118-19.) Under paragraph IV 2(F) of the Purchase Agreement,

Deutsch had the option to continue to receive referral fees from Nenner & Namerow in years

seven and eight. But a precondition to the exercise of the option, was that "Deutsch must be

willing and able to provide 'services' for Nenner's clients throughout years six and seven as

hereinafter described in paragraph seven, page 4 of 7 of the within Purchase Agreement." As

explained above, by 2014 Mr. Deutsch intentionally stopped servicing his caseload. (N.T.

9/16/19 at 139; N.T. 9/17/19 at 49; N.T. 9/18/19 at 105.) He stopped meeting clients in

Philadelphia and could not service the caseload remotely from Florida. (N.T. 9/17/19 at 108,

120, 126; N.T. 9/18/19 at 133-34.) It is true that Mr. Deutsch may have felt justified in doing so,

because Defendants breached their obligation to make timely goodwill payments. Nonetheless,

as explained above, Defendants never waived Mr. Deutsch's obligations that were prerequisite to

the exercise of the option, either in writing or orally. Even if the court were to find that

Defendants waived Mr. Deutsch's obligation to service the caseload by virtue of the "standstill"

agreement, this does not automatically waive the preconditions for the exercise of the option to

extend the Purchase Agreement. See Purchase Agreement at ¶ IV(15) ("No waiver of any

default or breach of any provision of this agreement or failure to enforce rights contained therein

shall operate as or be deemed a waiver or [sic][11] any subsequent default or breach or

termination"); Double-E Sportswear Corp. v. Girard Trust Bank, 488 F.2d 292, 298 (3d Cir.

1973) (Garth, J. concurring) ("[A] waiver limited to the particular condition, term or portion of

the written contract . . . does not constitute nor operate as a wholesale waiver . . . ."); 13

Williston on Contracts § 39:18 (4th ed. 2019) ("The waiver of one right under a contract does not

necessarily waive other rights under the contract; rather, the parties to a contract may waive parts

---

[11]     It appears "or" should be "of".

of its provisions").  See also Alderman v. Davidson, 954 P.2d 779, 782 (Or. 1998) ("[W]aiver of the right to enforce one provision of a contract does not automatically waive the right to enforce another.  Only if the waiver intends such a consequence will a court conclude that the right to enforce the second provision is waived.").  For all the above reasons, plaintiff could not exercise the option to extend the Purchase Agreement, and thus Defendants' obligations under the Purchase Agreement terminated on October 1, 2016, and they owe no monies to plaintiff for years seven and eight.

**VIII.**  **Conversion**

Plaintiff asserted a claim of conversion against Defendants for failing to pay all the monies they owed to plaintiff under the Purchase Agreement.  The Honorable John R. Padova denied the motion to dismiss this claim.  Deutsch v. Nenner & Namerow, P.C., 2018 WL 4328252 (E.D. Pa. May 23, 2018).  The court will not accept Defendants' invitation to revisit this ruling and will proceed to address the merits.  Nevertheless, the court finds that plaintiff has failed to prove a conversion claim.

Under Pennsylvania law, "conversion is the deprivation of another's right of property in, or use or possession of, a chattel or other interference therewith, without the owner's consent and without lawful justification."  Stevenson v. Economy Bank of Ambridge, 197 A.2d 721, 726 (Pa. 1964) (citation omitted).  Plaintiff simply has not established the elements of this claim.  As an initial matter, the court finds that neither Mr. Nenner nor Mr. Namerow have misappropriated money or acted in bad faith.  See N.T. 9/16/19 at 168-71; N.T. 9/17/19 at 96. Rather, Defendants failed to make timely payments to Mr. Deutsch because the Nenner & Namerow firm was losing money, and the parties had a bona fide dispute over the interpretation of the Purchase Agreement and Mr. Deutsch's effort in servicing the caseload.  Although

Deutsch did not receive timely payments in accordance with the terms of the Purchase Agreement, Deutsch benefitted from Defendants' failure to enforce Deutsch's obligations to service the caseload as required under the Purchase Agreement.  Furthermore, Deutsch's course of conduct demonstrates that he consented to Defendants' failure to make timely payments, at least until 2016 when he threatened to bring this lawsuit.  Additionally, given the disputes between the parties on the meaning of the Purchase Agreement, Defendants did not act without lawful justification in withholding payment until this court adjudicated these disputes.  See Pioneer Commercial Funding Corp. v. Am. Fin. Mortg. Corp., 855 A.2d 818, 827 (Pa. 2004) ("[A] claim of conversion cannot be sustained in the face of lawful justification on the part of the asserted tortfeasor.").  Accordingly, the court awards no damages to the plaintiff for conversion.

**VIII.  Conclusion**

For all the above reasons, the court will enter judgment in favor of plaintiff and against Defendants in the amount of $58,213.76 plus prejudgment interest.  The court arrives at this amount as follows:

$46,464.00  (Undisputed amount owed to plaintiff Exh. D-105)
  +6,416.00  (Cheryl Murphy clients)
$52,880.00
   -6,875.00  (Attorney fees for Molina case)
$46,005.00
+12,208.76  (Reimbursement to Deutsch for costs)
$58,213.76   Total

Plaintiff is entitled to prejudgment interest at the rate of 6% per annum from October 1, 2016.  See ECEM European Chem. Mktg. B.V. v. Purolite Co., 451 F. App'x 73, 79 (3d Cir. 2011) (not precedential); Delaware River Tow, LLC v. Nelson, 382 F. Supp. 2d 710,

711-13 (E.D. Pa. 2005).[12]

A Judgment Order will be entered.

BY THE COURT:

\_\_/s/ Thomas J. Rueter_____
THOMAS J. RUETER
United States Magistrate Judge

---

[12] The time period for which prejudgment interest is awarded begins on the date the sum is due, and runs until the time that judgment is entered. Nelson, 382 F. Supp. 2d at 713. Because the amount owed to plaintiff, with applicable offsets (Exh. D-105), is calculated as of the date the Purchase Agreement ended, October 1, 2016, the court uses this date for the start of the accrual period.